## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.                                                    Case No: 8:22-cv-2182-CEH-AAS

THE PRINCESS MARTHA, LLC,
TJM PROPERTIES, INC. and TJM
PROPERTY MANAGEMENT, INC.,

      Defendants.

_____

## <u>ORDER</u>

This matter comes before the Court on several pending motions for summary judgment.  In this employment action, the EEOC alleges that Defendants, The Princess Martha, LLC ("Princess Martha"), TJM Property Management, Inc. ("TJM Management"), and TJM Properties, Inc. ("TJM Properties"), unlawfully discriminated against Charging Party Sarah Branyan in violation of the Americans with Disabilities Act ("ADA") by failing to hire or accommodate her based on her disability.

All three Defendants have moved for summary judgment (Docs. 58, 59, 61). Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") has responded in opposition (Docs. 96, 97), Princess Martha and TJM Properties have replied (Docs. 98, 99), and the EEOC has filed a sur-reply to Princess Martha's motion (Doc. 110). Also before the Court is the EEOC's Motion for Partial Summary Judgment (Doc.

65), Princess Martha's response in opposition (Doc. 94), and the EEOC's reply (Doc. 101); as well as Princess Martha's motion to strike (Doc. 100) and the EEOC's response in opposition (Doc. 104).

Upon review and consideration, and being fully advised in the premises, the Court determines that Princess Martha's motion for summary judgment is due to be granted-in-part, to the extent that all Defendants are entitled to summary judgment as to Count I. TJM Properties' motion for summary judgment is also due to be granted-in-part, to the extent that TJM Properties is entitled to summary judgment as to a joint employer theory. The EEOC's motion for partial summary judgment is due to be granted in its entirety, and TJM Management's motion for summary judgment and Princess Martha's motion to strike are due to be denied.

## I.    MOTION TO STRIKE (Doc. 100)

The Court will first address, as a threshold, evidentiary matter, Princess Martha's motion to strike the declaration of Charging Party Sarah Branyan (Doc. 100). Princess Martha moves to strike Branyan's declaration, which the EEOC submitted in connection with its response in opposition to Princess Martha's motion for summary judgment. Doc. 93-30. Princess Martha argues that the assertions in the declaration are "in direct contrast to the testimony she provided at her deposition." Doc. 100 at 5. Because of its inherent inconsistency with the deposition testimony, Princess Martha contends that the declaration is a "sham affidavit" that should be disregarded. *Id.* at 6-8. In response, the EEOC argues that the declaration is not inconsistent with

Branyan's responses to Princess Martha's vague and ambiguous questions at her deposition, and it is fully consistent with the other documentary evidence. Doc. 104.

At her deposition, Branyan gave the following testimony:

> Q. In regard to your PTSD, what impairments does PTSD cause you to have, Ms. Branyan?
>
> A. It's resolved in some ways since this started, but really, prior to counseling, I had the night terrors and nightmares were the biggest.
>
> Q. And I asked a poor question. I didn't mean symptoms that you just told me about, but as far as like functioning in your day-to-day life, does the PTSD impair you from any major life functions that you carry out throughout your day?
>
> MR. MICHELEN: Object to Form.
>
> A. I – I think in day-to-day life, you know, once in a while I will be very short-fused with the people in my household, but the medication has been – that I take to manage it is the reason that I don't have those.

Doc. 62-1 at 131:7-22.

Branyan's declaration explains that she has taken prescription medication to manage her post-traumatic stress disorder ("PTSD") since 2020, and that the medication "helps alleviate" her PTSD symptoms. Doc. 93-30 ¶¶ 1-2. Branyan goes on to list the symptoms she was experiencing and describe them in detail. *Id.* ¶¶ 2-13. She clarifies, however, that she experiences those symptoms only when she is not taking her medications. *Id.* ¶¶ 12-13. Branyan then explains that her deposition testimony about being "short-fused" referred to "the PTSD symptoms I still experience even while taking Adderall and Valium." *Id.* ¶ 14.

Under the sham affidavit rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). A court may strike an affidavit as a sham when the affidavit flatly contradicts the affiant's previous testimony "for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016). However, "the rule only operates in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those which create an issue of credibility or go to the weight of the evidence." *Id.* (quotations omitted). Courts apply the rule sparingly "because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007), quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987).

Contrary to Princess Martha's argument, the Branyan declaration is not due to be stricken or disregarded as a sham affidavit, because it is not inconsistent with "clear answers to unambiguous questions" in her deposition testimony. Her testimony that "once in a while I will be very short-fused…but the medication…that I take to manage is the reason that I don't have those[,]" can readily be interpreted to mean that she is describing the impairments to her day-to-day functioning that occur now that she is taking medication, just as she explained in her declaration. Princess Martha's interpretation of her response as describing the only impairments she experiences with

4

or without medication is not unreasonable, but it is also not the only likely meaning. And Princess Martha failed to ask follow-up questions to clarify whether she was describing impairments that occur with or without medication, an ambiguity for which the initial question left room.   Branyan's declaration does not contain the type of unexplained contradictions that would render it a sham affidavit.   Accordingly, the motion to strike is due to be denied.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A. <u>Legal Standard</u>

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).   In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).   Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   A fact is "material" if it may affect the outcome of the suit under governing law.   *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N.*

*Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020), citing *Anderson*, 477 U.S. at 249-50. "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770, quoting *Anderson*, 477 U.S. at 252.

## B. Princess Martha's Motion (Doc. 58)

### 1. Relevant Facts[1]

Charging Party Sarah Branyan applied for a job at Princess Martha, a retirement community in St. Petersburg, Florida, in August of 2021. Doc. 95 ¶¶ 12, 1. After a successful interview, she was directed to take a drug test as the final step in the hiring process. *Id.* ¶¶ 15-16. Branyan would have been hired if she had obtained a satisfactory

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, and the Stipulation of Agreed Material Facts (Doc. 95). For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56. The facts related to the TJM Defendants' motions for summary judgment are addressed separately in Section E, *infra*.

result on the drug test. Doc. 62-2 at 188, 233.  Instead, however, her application was rejected on August 26, 2021. *Id.* at 203.

Branyan is a military veteran who had an active diagnosis of PTSD at the time of her application with Princess Martha. Doc. 95 ¶¶ 10-11; Doc. 62-1 at 85.  To treat her PTSD, she takes prescription medications that would cause a drug test to fail. *See* Doc. 62-1 at 98.  When she is not taking these medications, she experiences symptoms that include brain fog, anxiety, night terrors, difficulty communicating, difficulty going out in public, and panic attacks. Doc. 93-30 ¶¶ 7-12.  Before she began taking medication, her symptoms caused her to have public meltdowns at least twice a week; near-daily yelling, irrationality, inconsolable crying, or feeling overwhelmed with doom; and episodes of severe rage or panic attacks necessitating an emergency room visit multiple times a month. *Id.* ¶¶ 5-6, 13.

On August 18, 2021, Branyan interviewed with Brittany Knight, Princess Martha's activities director, for the position of Activities Coordinator. Doc. 95 ¶ 12. According to Branyan, "the first thing I said when I sat down was, I am a recovering addict, a veteran with PTSD, and I have this criminal background as a result of that service and I don't want to waste your time." Doc. 62-1 at 85.  Branyan was concerned that she would not be able to pass the background check, but Knight assured her that Princess Martha "work[s] with people with all different kinds of backgrounds; that that wouldn't be an issue." *Id.*  Branyan handed Knight several documents, including an FBI background screening, her resume, a military letter, and "the labels of the medication for that month." *Id.* at 79-80.  Knight "kind of…did a flip thing and then

handed [the stack of papers] right back to me"; with respect to the medication labels, Knight "didn't review them" and "kind of brushed them off," stating that "if they were prescription medications, that's something the lab will check." *Id.* at 80-81. Branyan did not tell Knight the names of her medications, *id.* at 81, but she did inform her they were "psychiatric medications." Doc. 93-8 at 3.

Knight gave Branyan a tour of Princess Martha, and they discussed the type of facility Princess Martha is, the role and hours of the Activities Coordinator, and the type of activities the facility was doing at that time. Doc. 95 ¶ 13; Doc. 62-1 at 175. When discussing the fact that the position would not require driving, Branyan informed Knight that she takes "a medication that says not to operate a vehicle on it." *Id.* at 84. Knight ran a background check on Branyan in front of her, and Branyan passed. *Id.* at 82. At the end of the interview, Branyan understood that she had the job as long as she passed a drug test. *Id.* at 81. Knight instructed her to complete the drug test within 48 hours. *Id.* at 82, 174.

Knight's recollection of Branyan's interview is similar to Branyan's in many respects. Doc. 62-3 at 63-64, 72, 83-88. However, she denied that Branyan attempted to hand her any paperwork, including copies of medication labels,[2] or that Branyan disclosed that she was on medication that may cause a drug test to fail or that she was

---

[2] Knight "specifically remembers" that Branyan did not hand her any paperwork, because Branyan had written on the hard copy of the job application that she filled out during the interview that her criminal record was "attached." Doc. 62-3 at 73, 77-78, 82. When Knight pointed out to Branyan that nothing was attached to the application except for Branyan's resume, Branyan said she "would get it to" Knight. *Id.* at 78. Knight told her she was welcome to do so, but that Princess Martha would run a background check anyway. *Id.* at 79.

"a veteran with PTSD." *Id.* at 73, 77, 79, 81-84.  When the interview was finished, Knight brought a Request to Hire form to Princess Martha's executive director for her approval, and then to Andrea Von Blomberg, the human resources ("HR") director. *Id.* at 74-76, 89.  Von Blomberg ran Branyan's background check, and Knight gave Branyan information about the drug testing procedure. *Id.* at 75-76, 84-85, 95; Doc. 95 ¶ 14, 16.

Princess Martha requires applicants to complete a drug test before they can receive a final offer of employment. *Id.* ¶¶ 4-5; Doc. 93-9 at 40.  Applicants must provide a urine sample to BayCare, a collection facility, within 48 hours of their interview. Doc. 95 ¶¶ 4-5, 7.  BayCare conducts a rapid test on the specimen to determine if it is "negative" or "non-negative." Doc. 93-10 at 3.  If it is "non-negative," it will be shipped to an outside lab for additional testing to eliminate non-drug use as a cause for a positive result. *Id.*

Von Blomberg, Princess Martha's HR director, monitors applicants' drug test results on a web portal called eScreen, and proceeds with the hiring process once eScreen displays a final result. Doc. 95 ¶ 8; Doc. 62-2 at 98-99, 101, 168.  If she has questions about a drug screening she can contact Princess Martha's assigned account representative at BayCare. *See id.* at 100-101, 210; Doc. 93-15 at 3-4.  However, Von Blomberg testified that it was not her practice to reach out to BayCare on behalf of applicants, because it was the applicants' "responsibility…to follow through that process." *Id.* at 210-13.  It is her practice to contact an applicant a single time if she does not see a test result on eScreen within 24 hours. *Id.* at 168.  If she still does not

see a result after one communication, "I just automatically assume they moved on to another position[.]" *Id.*

Branyan provided a sample to BayCare on August 19, 2024, after Von Blomberg called to remind her to take the test. Doc. 95 ¶ 17; Doc. 62-2 at 196-97. Because her rapid test displayed a "non-negative" result, BayCare sent her sample to the lab for further testing. Doc. 62-1 at 88-90. Unbeknownst to Branyan and Princess Martha, the sample was lost in the mail and was never received by the lab. Doc. 93-15 at 3, 8, 15.

Branyan brought her prescription labels to BayCare when she took the test, but was told that the lab would contact her for that information. *Id.* at 90. However, the lab never called her. *Id.* at 90-91. After waiting several days, Branyan contacted BayCare and the lab, but both of them told her she had to communicate with the employer about her test results and prescriptions. *Id.* at 94-97. Branyan then contacted Princess Martha, leaving the following voicemail for Von Blomberg on August 24, 2021:

> Hi, this is Sarah Branyan. My phone number is (---)--- -----. I'm a little taken aback by the drug test procedures, because I'm on two medications which would make me look like I would fail a drug test. I explained that to the people there. They said they're only a collection site and they refused to take my list of medications. They told me they sent it to LabCorp, and LabCorp would check my list of medications, but LabCorp never called me. And then when I called back today, they said that I can just send it right to the employer, and that they would verify medications and decide if they wanted to hire me based on that. So, I'm hoping you can give me a call back as soon as possible and let me know if you guys are still interested. Thanks, and have a great day.

Doc. 62-1 at 98-99.

The eScreen portal indicated that Branyan's test was "sent to lab." Doc. 93-13. Although Von Blomberg checked for Branyan's test results several times a day, the information did not change. Doc. 62-2 at 209, 231. Von Blomberg testified that she assumed "sent to lab" was still displaying because Branyan had failed to provide documentation to the lab, which was the "common denominator" when the lab did not provide a result. *Id.* at 231-32, 249.[3] After waiting a week, on August 26, 2021, Von Blomberg sent Branyan a rejection notification and moved on to other applicants. *Id.* at 203, 244. Von Blomberg did not recall receiving Branyan's August 24, 2021 voicemail, but said it was "possible" she listened to it. *Id.* at 200-201. Even if she had listened to it, however, if she "went back to eScreen and I didn't see any [lab] results, more than likely it would still be that we moved on to another applicant." *Id.* at 201-02.

Von Blomberg testified that she does not "have communication with BayCare or the lab." *Id.* at 210. If an applicant had an issue contacting the lab, Von Blomberg would direct them to BayCare. *Id.* at 171-72. Likewise, if an applicant was taking prescription medication that affected the drug test, "that would have to be resolved between the applicant and the lab." *Id.* at 171; *see also id.* at 194. At the same time, Von Blomberg testified that if eScreen displays a positive result, she "would verify that

---

[3] In July 2021, Princess Martha had experienced an applicant who failed to respond to the lab; eScreen displayed a result of "Positive unable to contact donor" in that case. Doc. 92-14; Doc. 62-2 at 247-48.

what's showing matched the records" of the applicant's prescribed medication. *Id.* at 195; *see also id.* at 233 ("If she would have received an immediate positive result, all we would have needed from her was the prescribed medicine from her medical provider"). She explained that what was missing in Branyan's case was any result. *Id.* at 234.

Von Blomberg denied that Knight ever told her Branyan had PTSD or was taking prescription medications. Doc. 62-2 at 192-193.  Knight testified that if Branyan had told her she was a veteran with PTSD or that she was on prescription medication that may cause a drug test to fail, Knight would have "initiated her with [Von Blomberg] to get any documentation needed" or to "initiate the next steps." Doc. 62-3 at 93-94.  Knight would have been "required" to notify HR if Branyan had disclosed that she was on a prescription medication that may cause a drug test to fail. *Id.* at 94. Von Blomberg agreed that Knight would have informed her if Branyan had disclosed such information. Doc. 62-2 at 193.  If Branyan had "mentioned her PTSD status to Ms. Knight during the interview," however, Knight would "not necessarily" have shared it with Von Blomberg unless it would "affect the performance of the position." *Id.* at 192-93.

In January 2022, another job applicant for the Activities Coordinator position disclosed to Knight by email that she used medical cannabis due to a disability. Doc. 95 ¶ 24.  Knight forwarded the email to Von Blomberg, because she understood it to be a request for an accommodation to the drug test. *Id.* ¶ 25; Doc. 62-3 at 125-26.  After receiving a "positive" drug test result, Doc, 92-14, the applicant was hired for the position. Doc. 62-3 at 116.

Branyan filed a charge of discrimination with the EEOC against Princess Martha on November 22, 2021. Doc. 95 ¶ 2. The EEOC initiated the instant lawsuit on September 21, 2022. Doc. 1. Count I of the Amended Complaint alleges that Princess Martha and the TJM Defendants committed disability discrimination against Branyan by failing to hire her, while Count II alleges that they failed to reasonably accommodate her disability. Doc. 24.

Princess Martha, joined by the TJM Defendants,[4] now moves for summary judgment on both counts of the Amended Complaint. It first argues it is entitled to summary judgment on the disability discrimination count for four reasons: 1) Branyan's PTSD does not impair her functioning enough to render her disabled; 2) she is not a qualified individual because she did not complete the drug testing that is a requirement of the position; 3) Von Blomberg, the decisionmaker for the adverse action, had no knowledge of her alleged disability; and 4) the EEOC cannot show that the non-discriminatory reason for not hiring her—the lack of result for her drug test— was pretextual. With respect to the failure to accommodate claim, Princess Martha argues that Branyan never triggered Princess Martha's ADA duties by making a specific demand for accommodation. Each argument will be addressed in turn.[5]

---

[4] The TJM Defendants' motions for summary judgment incorporate by reference the substantive arguments in Princess Martha's motion, with the Court's permission. Doc. 51; Doc. 59 at 1 n.1; Doc. 61 at 1 n.1.

[5] Princess Martha raises a procedural argument in its reply that the statement of material facts in its motion for summary judgment should be deemed undisputed, because the EEOC failed to specifically dispute it by paragraph number and instead simply submitted its own statement of facts. Doc. 99 at 1-2. Because the EEOC's response sufficiently identifies the facts that are in dispute, Princess Martha's argument is unavailing.

## 2.  Failure to Hire (Count I)

The ADA prohibits discrimination in employment "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  A plaintiff alleging disability discrimination must demonstrate that: (1) she is disabled, (2) she was a "qualified individual" when she was terminated, and (3) she was discriminated against because of her disability. *See*, *e.g.*, *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (citation omitted).

Where a plaintiff relies on circumstantial evidence of discrimination, rather than direct evidence, courts apply the *McDonnell-Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).  First, the plaintiff must establish a prima facie case of disability discrimination through the three elements above. *Id.* The burden then shifts to the employer "to articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Id.*  The employer's burden is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  If the employer meets its burden, the plaintiff will not survive summary judgment unless she presents sufficient evidence to create an issue of fact that the articulated reason was a pretext for discrimination. *Cleveland*, 369 F.3d at 1193; *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 853 (11th Cir. 2019) (citations omitted).  To show pretext, a plaintiff must "demonstrate[ ] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (quotation omitted).

Here, there are genuine issues of fact as to whether Branyan is a qualified individual with a disability.  However, the EEOC has not set forth evidence demonstrating the existence of a genuine dispute of fact as to the third element of a prima facie case: that Von Blomberg failed to hire Branyan "on the basis of" her disability. *See Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024); 42 U.S.C. § 12112(a).  Accordingly, the Court need not address the possibility of pretext, and all Defendants are entitled to summary judgment as to Count I.

### a. Disability

First, there is sufficient evidence for a reasonable jury to conclude that Branyan is disabled.  A disability is "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A).  The ADA provides that the definition of disability must "be construed in favor of broad coverage of individuals…to the maximum extent permitted" by the statute's terms. *Id.* § 12102(4)(A).  A major life activity "includes the operation of a major bodily function, including [] functions of the [] brain." *Id.* § 12102(2)(B).  The implementing regulations of the ADA provide examples of some types of impairments that will "virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. 1630.2(j)(3)(ii).  As one example, the regulations state that it "should easily be concluded" that PTSD substantially limits brain function. *Id.* § 1630.2(j)3)(iii).

It is undisputed that Branyan had an active diagnosis of PTSD at the time she applied for the Activities Coordinator position. Doc. 95 ¶ 11.  Her declaration explains that she experiences, *inter alia*, brain fog, anxiety, night terrors, difficulty communicating, difficulty going out in public, and panic attacks when she is not on medication for her PTSD. Doc. 93-30 ¶¶ 7-12.  Before she began taking  medication, she would have public meltdowns at least twice a week; near-daily yelling, irrationality, inconsolable crying, or feeling overwhelmed with doom; and episodes of severe rage or panic attacks necessitating an emergency room visit multiple times a month. *Id.* ¶¶ 5-6, 13; *cf. Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1273 (11th Cir. 2020) (defendant entitled to summary judgment where plaintiff failed to state how often and how long she experienced the symptoms she described).  These symptoms constitute impairments to her brain function when she is not medicated. *See* 42 U.S.C. § 12102(4)(E)(i) ("[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," including medication).  Based on Branyan's declaration, the Court has no difficulty in concluding that a reasonable jury could find she is disabled within the meaning of the ADA.

### b.  Qualified Individual

A reasonable jury could also conclude that Branyan was a qualified individual. A "qualified individual" is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  To survive summary

judgment on this element, "the plaintiff must provide evidence sufficient for a jury to find that...she could perform the essential functions of that job with or without reasonable accommodations." *Dickey v. Dollar General Corp.*, 351 F. App'x 389, 391 (11th Cir. 2009), citing *Lucas v. Grainger*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).

Princess Martha argues that Branyan is not a qualified applicant because a satisfactory drug test result is required for employment, and Branyan did not receive any result from her drug test. Doc. 58 at 16-17.  This argument is unavailing.  To the extent receiving a drug test result is considered an "essential function" of the position, as Princess Martha contends, there is no dispute that Branyan's failure to receive a drug test result resulted from an external factor—the sample was lost—rather than an inability on her part.  In other words, she "could" receive a drug test result, and would have if her sample had not been lost.  A reasonable jury could therefore find that she "could perform" that essential function. *See Dickey*, 351 F. App'x at 391; *see also Henderson v. Sovereign Healthcare of Tuskawilla, LLC*, No. 6:15-cv-1879, 2017 WL 1376164, *4 (M.D. Fla. Apr. 17, 2017) (a reasonable jury could find that plaintiff was qualified for the job even though she stopped the hiring process before submitting fingerprints, where there was no evidence she could not perform the job's essential functions, and there was a genuine issue of fact as to whether the failure to submit fingerprints resulted from discrimination).

Princess Martha does not dispute that Branyan was not otherwise qualified for the position of Activities Coordinator, and there is ample evidence that Branyan would have been hired if she had produced a negative drug test result or a positive result that

17

corresponded with her prescription medications. *See* Doc. 97 at 15.  Construing the facts in the light most favorable to the EEOC, a reasonable jury could find that Branyan was a qualified individual.

### c.  Causation

The evidence compels a different result with respect to the element of causation. For this element, the EEOC must prove that Princess Martha would have hired Branyan but for her disability. *See Akridge*, 93 F.4th at 1192.  To establish that an employee's disability was a causal factor in an adverse action, a discrimination plaintiff must demonstrate that the employer's agent who made the termination decision had actual knowledge of the employee's disability. *Pecora v. ADP, LLC*, 232 F.Supp.3d 1213, 1219 (M.D. Fla. 2017), citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1175 (11th Cir. 2005).  Princess Martha argues there is no evidence that Von Blomberg, who was the decisionmaker, was aware of Branyan's disability when she decided not to hire her. Doc. 58 at 18.  The EEOC responds that "there is sufficient circumstantial evidence to infer Von Blomberg did know…that Branyan's drug test results were because of prescription medications she was taking for her disability (PTSD)." Doc. 97 at 17-18.

There are two significant pieces of evidence that bear on the question of Von Blomberg's knowledge.  First, it is undisputed that Branyan left her a voicemail on August 24 in which she stated, "I'm on two medications which would make me look like I would fail a drug test." Doc. 62-2 at 199.  Von Blomberg does not recall listening to it but agrees it was possible she did, Doc. 62-2 at 200, and there is no evidence she

did not listen to it.  At this stage, the Court must assume that she did, because to do "otherwise would be to deny Plaintiff the benefit of resolving all reasonable inferences in her favor as the nonmoving party." *Mora v. Jackson Mem. Foundation, Inc.*, 597 F.3d 1201, 1205 (11th Cir. 2010).

However, the statement that Branyan is "on two medications" did not provide notice that she has a disability.  "Vague or conclusory statements revealing an unspecified capacity are not sufficient to put an employer on notice of its obligations under the ADA." *Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996) (knowledge that plaintiff was illiterate and had taken special education courses did not put employer on notice of developmental disorder).  After all, "[t]he ADA does not require clairvoyance." *Hedberg v. Ind. Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995). In *Hedberg*, the court held that knowledge of the plaintiff's symptoms did not equate to knowledge of a disability, where the symptoms were not "so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." *Id.*  "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001).

For this reason, courts have held that limited information that a plaintiff has a medical condition or receives medical treatment is not enough to demonstrate a decisionmaker's actual knowledge of a disability for ADA purposes.  In *Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1294 (M.D. Ala. 2012), *aff'd*, 550 F. App'x 748 (11th Cir. 2013), for example, the court found that the decisionmaker's knowledge that the

plaintiff had Graves' disease did not put him on notice that the diagnosis would render the plaintiff disabled.  As the court concluded, "the ADA only requires employer to account for *known* disabilities when making employment decisions…so just because an employer knows an employee has some sort of impairment doesn't mean that the employer automatically knows the impairment substantially limits a major life activity of that employee." *Id.* (emphasis in original); *see also Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1220 (M.D. Fla. 2017) (plaintiff's statement that he was "dealing with 'a ton of anxiety'…that made it difficult for him to perform his duties at work" did not establish knowledge of a mental disability); *Moreira v. Am. Airlines, Inc.*, 157 F. Supp. 3d 1208, 1215-16 (S.D. Fla. 2016) (statement that plaintiff was going to physical therapy did not put decisionmaker on notice of disability); *Williamson v. Clarke Cnty. Dep't of Hum. Res.*, 834 F. Supp. 2d 1310, 1324 n.18 (S.D. Ala. 2011) (knowledge that plaintiff was seeing a physician and continuing "medication management" was not knowledge of a disability); *Forsyth v. Univ. of Alabama Bd. of Trustees*, No. 7:17-cv-854, 2018 WL 3012343, *4 (N.D. Ala. June 15, 2018) (observing symptoms of depression and knowledge that plaintiff sought counseling did not put decisionmaker on notice of disability).[6]

---

[6] This principle is not limited to courts within the Eleventh Circuit. *See, e.g., Andrews v. U.S. Bank, N.A.*, No. 22-56120, 2024 WL 658957, *1-2 (9th Cir. Feb. 16, 2024) (plaintiff's "passing references to his medication and his tic disorder" did not put employer on notice of a disability, and employer had no obligation to make further inquiries into his medical condition after learning that he was taking medication); *Cozzi v. Great Neck Union Free Sch. Dist.*, No. 05-cv-1389, 2009 WL 2602462, *15 (E.D.N.Y. Aug. 21, 2009) (knowledge of plaintiff's herniated discs was not enough to put defendants on notice that plaintiff was disabled by her condition within the meaning of the ADA); *Brown v. BKW Drywall Supply,*

Branyan's statement that she is "on two medications" that would cause her to fail a drug test is exactly the kind of vague, limited information that does not put an employer on notice of a disability within the meaning of the ADA.  From hearing the voicemail, Von Blomberg would have no knowledge of the type of medication that Branyan takes or the medical condition or conditions that necessitate it.[7]  She could not glean or assume that Branyan suffered from an impairment that substantially limits one or more life activities.[8]  After all, many non-disabled people take prescription

---

*Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems…is not the same as knowing that the employee suffers from a disability."); *Moore v. Time Warner GRC 9*, 18 F. Supp. 2d 257, 261-62 (W.D.N.Y. 1998) (knowledge that plaintiff suffered from diabetes or hypertension was not equivalent to knowing that his condition disabled him within the meaning of the ADA); *Kolivas v. Credit Agricole*, No. 95 Civ. 5662, 1996 WL 684167, *5 (S.D.N.Y. Nov. 26, 1996) (information that plaintiff was prescribed medication, was being treated by a psychiatrist, was depressed, and needed time off was not sufficient to inform the company that he had a disability), *aff'd,* 125 F.3d 844 (2d Cir.1997).

[7] *Cf. Lisby v. Tarkett Ala., Inc.*, No. 3:16-cv-01835, 2020 WL 1536386, *5 (N.D. Ala. March 31, 2020) (decisionmaker knew plaintiff was prescribed amphetamines and methadone); *Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*, No. 1:21-cv-451, 2024 WL 1288634, *32 (E.D. Tex. March 25, 2024) (decisionmakers' awareness of the specific medications plaintiff took and the disabilities they could be used to treat created a genuine dispute of fact as to knowledge of disability).

The EEOC cites *Stainback v. Citadel Broad. Co. Corp.*, No. 2:13-cv-812, 2014 WL 7330833, *14-15 (N.D. Ala. Dec. 19, 2014), in support of the assertion that the decisionmaker does not need to know "all the specifics" to demonstrate knowledge of a disability. Doc. 97 at 18.  But the *Stainback* court found that the decisionmaker's knowledge that the plaintiff had a heart attack and required rehabilitation raised a genuine issue of material fact as to whether the defendants *regarded* the plaintiff as disabled. 2014 WL 7330833 at *15.  The EEOC does not pursue a "regarded as" theory of disability in this action. *See* 42 U.S.C. § 12102(1)(C); Doc. 24 ¶ 116; Doc. 97 at 13-14.  *Stainback* is therefore inapposite.

[8] *Cf. Conn v. Am. Nat'l Red Cross*, 149 F.Supp.3d 136, 149-50 (D.D.C. 2016) (decisionmaker had actual knowledge of plaintiff's disability where he was aware that she had been treated by a psychologist for five years for anxiety issues, that her anxiety qualified as a serious health condition, and that she was "heavily medicated and not able to travel or work," which allowed for the inference that he knew plaintiff "suffered from *some* serious mental

medications, including medications that may be revealed in a drug test. *See Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520, 524 (6th Cir. 2013) ("Though the doctor's note said Bailey was taking some sort of medication that perhaps could cause a positive drug screen, this medication might have been Tylenol for all Real Time knew."). Nor did Von Blomberg have an obligation to investigate further to determine whether Branyan was taking medications due to a disability. *See Andrews*, 2024 WL 658957 at *2, *supra* n.6. Without more, the August 24 voicemail does not create a material dispute of fact as to Von Blomberg's knowledge of Branyan's disability.

The second significant piece of evidence is a factual dispute regarding Branyan's interview. Knight unequivocally denied that Branyan shared her PTSD diagnosis, mentioned prescription medications, or disclosed a disability at the interview. Doc. 62-3 at 82-85, 129. But Branyan testified that her PTSD diagnosis was one of the first things she told Knight. Doc. 62-1 at 85. She also stated that she disclosed to Knight that she takes "a medication that says not to operate a vehicle on it" and "psychiatric medications." *Id.* at 84; Doc. 93-8 at 3. Here, too, the Court will resolve this evidentiary conflict in Branyan's favor as the non-movant. *See Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019).

Knight is not the decisionmaker, however, and her knowledge cannot be imputed to Von Blomberg. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1183 (11th Cir. 2005) (explaining why constructive knowledge theory based on other employees'

---

impairment that would substantially limit a major life activity—an impairment that would therefore qualify as a disability under the ADA.") (emphasis in original).

knowledge failed). Therefore, the EEOC must identify evidence from which a reasonable jury could find that Knight shared this information with Von Blomberg. Both Knight and Von Blomberg denied that she did so. Doc. 62-3 at 82-85; Doc. 62-2 at 192-93. The EEOC argues that a reasonable jury could choose not to credit their denials in light of Branyan's testimony about her disclosure to Knight, because "Knight was required to escalate this information to Von Blomberg and would have done so, [and] Knight spoke to Von Blomberg about Branyan's drug test the day of the interview[.]" Doc. 97 at 17. Indeed, Knight and Von Blomberg testified that Knight would have informed Von Blomberg that an applicant required assistance with the drug test because of a prescription medication. Doc. 62-3 at 57-58, 93-94; Doc. 62-2 at 193. Knight did so on a subsequent occasion when an applicant disclosed the use of medical marijuana. *See* Doc. 62-3 at 124-28, 183. The EEOC contends that this circumstantial evidence creates a genuine dispute of fact as to Von Blomberg's knowledge of Branyan's disability.

When the non-movant relies on circumstantial evidence at summary judgment, the Court must determine whether the inferences to be drawn from such evidence are plausible. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citations omitted). Summary judgment may be granted only if "no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Id.* On the other hand, in the face of a clear denial of knowledge by the decisionmaker, a plaintiff cannot withstand summary judgment through mere speculation about what the decisionmaker might have been told. In *Clover v. Total Sys. Servs., Inc.*, 176 F.3d

1346, 1355 (11th Cir. 1999), a retaliation case, the court found that evidence that the decisionmaker spoke with a person who knew about the protected activity before taking the adverse action did not create a reasonable inference that the decisionmaker learned about the protected activity during that conversation; such an inference amounted to "pure speculation," because "'could have told' is not the same as 'did tell.'"  Here, however, the testimony of two witnesses that Knight *would have*—not 'could have'—shared Branyan's disclosure with Von Blomberg if it had occurred raises the inference from speculation to plausible. *See*, *e.g.*, *Whiteside v. PCC Airfoils LLC*, No. 5:21-cv-62, 2023 WL 2787977, *11 (S.D. Ga. April 5, 2023) (witness agreed that if plaintiff had complained to him about race discrimination, she would have called decisionmaker to discuss it; that testimony combined with the fact that a call took place soon after disclosure created a genuine dispute of fact).  Accordingly, the Court will assume that Knight followed her practice in Branyan's case.

Nonetheless, this assumption leads to the same conclusion as the August 24 voicemail.  Knight's and Von Blomberg's testimony indicates that it was Knight's required practice to notify Von Blomberg that an applicant was taking prescription medications that might cause a drug test to fail. Doc. 62-2 at 193; Doc. 62-3 at 93-94. To the extent Branyan disclosed to Knight that the reason she took medications was that she had a disability within the meaning of the ADA, there is no indication that Knight was required to or that it was her practice to share that information with Von

Blomberg.[9]  She *could have*, but the EEOC's requested inference that she *did* amounts to "pure speculation" that cannot withstand summary judgment. *See Clover*, 176 F.3d at 1355.  The Court has already concluded that the information that Branyan took unspecified prescription medications that may cause a drug test to fail did not give Von Blomberg actual knowledge that Branyan was disabled.  Accordingly, because no reasonable jury could conclude Von Blomberg had actual knowledge that Branyan was disabled, the EEOC cannot demonstrate causation, or, as a result, make out a prima facie case of disability discrimination.  Defendants are entitled to summary judgment as to Count I.

### 3.  Failure to Accommodate (Count II)

An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability.

---

[9] *See* Doc. 62-2 at 193:

> Q: If Ms. Branyan had mentioned her PTSD status to Ms. Knight during the interview, is that something Ms. Knight should have told you?
>
> A: Not necessarily.  If it was something that was not going to affect the performance of the position, then not necessarily.

The Court acknowledges Knight's testimony that, "[i]f during the interview Ms. Branyan mentioned to you that she was a veteran with PTSD," she "would have initiated [Branyan] with [Von Blomberg] to get any documentation needed." Doc. 62-3 at 93.  However, in the context of the questions and answers that surrounded this statement, the only plausible interpretation is that Knight was referring to documentation of medications, as she went on to explain, rather than documentation of PTSD.  There is no evidence that Knight was required to notify or in the practice of notifying Von Blomberg about applicants' medical conditions or that she believed documentation was needed for any purpose other than prescriptions for the drug test.

*Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) (citation omitted).  A failure to accommodate is actionable under the ADA if it negatively impacts, *inter alia*, a potential employee's hiring. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).  "To trigger an employer's duty to provide a reasonable accommodation, the employee must (1) make a specific demand for an accommodation and (2) demonstrate that such an accommodation is reasonable." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022), citing *Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016).  At that point, the employer must "initiate an informal, interactive process with the employee to discuss the employee's specific limitations, explore potential accommodations, and select the most appropriate accommodation for both the employer and the employee." *Owens*, 5 F.4th at 1334.[10]

Princess Martha argues that Branyan did not trigger Princess Martha's duty to initiate an interactive process because she did not make a specific demand for an accommodation "due to her PTSD." Doc. 58 at 21.  Even if she disclosed her PTSD diagnosis to Knight at the interview, "she did not link her alleged disability to the prescriptions she was taking" as required by *Owens*. *Id.* at 22-23.  Knight did not review Branyan's medication labels, and Princess Martha was not obligated to speculate about her need for prescriptions. *Id.*; Doc. 99 at 8.  Princess Martha also argues that

---

[10] Although the Eleventh Circuit was addressing a Rehabilitation Act claim instead of an ADA claim in *Owens*, "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000).

the lack of a drug test result, which resulted from a "breakdown of communication between BayCare, the lab, Branyan, and Princess Martha[,]" meant that a duty to accommodate Branyan by reviewing her prescriptions never arose. *Id.*; Doc. 58 at 22.

With respect to the latter point, the EEOC contends that Von Blomberg failed to accommodate Branyan when she refused to contact BayCare or the lab to follow up about Branyan's test results once Branyan notified her that there was a problem. Doc. 97 at 9, 23. The EEOC asserts that Princess Martha is responsible for any failure of the lab or BayCare, and a "breakdown of communication" did not come from Branyan. *Id.* at 22. Further, the EEOC argues that Branyan triggered the interactive process when she identified her disability of PTSD and specified how the proposed accommodation of providing proof of prescription medications would allow her to comply with the drug test. *Id.* at 21-22. The EEOC contends that Knight's refusal to accept or review Branyan's list of prescriptions does not insulate Princess Martha from the obligation to engage in the interactive process. Doc. 110 at 4-5.

First, as the initial step in triggering the interactive process, the Court finds that Branyan made a specific demand for an accommodation. *See Owens*, 52 F.4th at 1334. Princess Martha's view that Branyan's requested accommodation could not occur until there was a test result is too narrow. The accommodation Branyan requested in this case was assistance with the drug test procedures in light of her need for prescription medication. Branyan made clear to Knight at the interview and Von Blomberg in the August 24 voicemail that she wanted to provide documentation of prescriptions she believed would cause her to fail the drug test. Her voicemail sought

clarification regarding to whom Branyan should provide the documentation.  To the extent Von Blomberg believed Branyan was required to provide it to the lab or BayCare,[11] Branyan's statement in the voicemail that the lab told her she needed to give it to Princess Martha instead and her request for a call back can be fairly interpreted as a request for an accommodation in the form of assistance with the testing procedures.  A reasonable jury could find that Von Blomberg should have engaged in an interactive process at that point—which may have uncovered the lost sample problem—rather than simply rejecting Branyan because there was no test result.[12]  Accordingly, there are genuine disputes of fact as to Branyan's specific demand for accommodation.

There are also genuine disputes of fact as to whether Branyan demonstrated that her requested accommodation was reasonable, as the second step in triggering the interactive process.  In *Owens*, the Eleventh Circuit elaborated on the requirement that an employee demonstrate that their requested accommodation is reasonable: the employee must: (a) "identify her disability," and (b) "suggest how the accommodation

---

[11] Von Blomberg's testimony about the procedure was unclear.  She testified that an applicant was required to provide medication information to the lab only, but also stated that she would review a prescription list herself if she saw a positive test result.  *See* Doc. 62-2 at 171-72, 193-95.

[12] Von Blomberg testified that her hands were tied unless and until eScreen displayed a test result of positive, negative, or cancelled, because it was not her practice to contact BayCare to follow up about applicants' tests. Doc. 62-2 at 201-02, 212.  But aside from her practice, which she later changed anyway, she did not identify any obstacle that prevented her from at least attempting to contact her BayCare representative on Branyan's behalf after receiving the voicemail.  Or, at a minimum, Von Blomberg could have called Branyan back to learn more about what was going wrong.  Her decision to reject Branyan instead of taking these actions could lead a reasonable jury to find that her failure to accommodate negatively impacted Branyan's hiring. *See Beasley*, 69 F.4th at 754.

will overcome her physical or mental limitations." 52 F.4th at 1334.  With respect to the first prong, the employee "must identify—at least in broad strokes—the limitations her mental or physical condition imposes." *Id.* at 1335.  The "type and extent" of information the employee must provide about her disability will depend on the amount of information needed to understand the link between her limitations and the requested accommodation. *Id.* at 1335-36.  Even where additional information is needed to make the link clear, the court stated that it "expect[s] an employee's informational burden to be modest." *Id.* at 1336.  The disclosure of "detailed or private information about [a] disability" is not required to trigger the employer's duty to engage in an interactive process, since detailed information about a disability "may be irrelevant to identifying and justifying accommodations[.]" *Id.* (quotation omitted).

Branyan testified that she informed Knight that she was a "veteran with PTSD." Doc. 62-1 at 85; *see* 29 C.F.R. 1630.2(j)(3)(iii) ("it should be easily concluded" that PTSD substantially limits brain function).  She also told both Knight and Von Blomberg that she takes prescription medications that would cause her to fail a drug test.  And, significantly, she specified to Knight that they were "psychiatric medications." Doc. 93-8 at 3.[13]  Although she did not tell Knight the names of the

---

[13] Princess Martha asks the Court to disregard the statement in Branyan's EEOC charge that she disclosed that she takes "psychiatric medications" because it contradicts her deposition testimony, is inadmissible hearsay, and is an unsworn statement. Doc. 99 at 3-5.  These arguments are unavailing.  First, there is no contradiction.  In response to the question "Did you tell [Knight] that you at the time took Adderall, Valium, and Abilify?" Branyan testified that she "certainly did not tell her the list." Doc. 62-1 at 81.  That she did not state the specific names of her medications does not mean she did not describe them as "psychiatric medications" when discussing the drug test.  The testimony is therefore not inconsistent. (…)

medications, she handed the prescription labels to Knight to review; Knight declined to do so. *Id.* at 80-81, 85.

If the jury credits Branyan's testimony, the information she disclosed to Knight was sufficient to satisfy her modest burden of identifying a statutory disability. Moreover, she linked her disclosed disability to an accommodation by asking if she could provide documentation of her prescriptions for psychiatric medications that would cause her to fail a drug test. *Cf. Chandler v. Sheriff, Walton Cnty.*, No. 22-13698, 2023 WL 7297918, *6 (11th Cir. Nov. 6, 2023) (the plaintiff's "general discussion" with his employer about his "depression and PTSD—with no specific mention that Chandler considered these common conditions disabling and no request by Chandler for accommodations or medical paperwork corroborating his claims—did not put [the employer] on notice" about his statutory disability or trigger the employer's duty to accommodate); *Owens*, 52 F.4th at 1336-37 (plaintiff's disclosure of conditions and procedures that may *cause* a disability did not identify a specific impairment that substantially limits a major life activity).  Accordingly, there are genuine disputes of

---

(…) Moreover, the EEOC is correct that the contents of the EEOC charge can be reduced to admissible form through Branyan's testimony at trial. Doc. 110 at 3 n.1; *see Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).  Testimony about what Branyan told Knight would not be considered hearsay if it is offered for its effect on the listener rather than the truth of the alleged statement. *See* Fed. R. Evid. 801(c).  Finally, contrary to Princess Martha's contention, an EEOC charge of discrimination is a sworn statement that complies with Rule 56. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (discussing regulations governing EEOC charges, including requirement that they are sworn or signed under penalty of perjury).

material fact as to whether Princess Martha failed to accommodate Branyan's disability.  Defendants are not entitled to summary judgment as to Count II.

### C. **EEOC's Motion (Doc. 65)**

In its motion for partial summary judgment, the EEOC seeks summary judgment in its favor on two of Princess Martha's affirmative defenses: affirmative defense numbers six and nine.

### 1. **Affirmative Defense No. Six**

Princess Martha's sixth affirmative defense states:

> Charging Party's claims are barred by the doctrines of estoppel and unclean hands to the extent that Charging Party's own conduct contributed to her alleged damages.

Doc. 29 at 15.  The EEOC argues that there is no evidence to support the defenses of estoppel or unclean hands. Doc. 65 at 6-11.  To the extent that the doctrine of equitable estoppel and unclean hands may be applied against the federal government, it requires a showing of affirmative and egregious misconduct by government agents, but no evidence supports such a finding in the EEOC's handling of the case. *Id.* at 6-8, 9-11. Further, Branyan's conduct cannot support a finding of equitable estoppel or unclean hands as a matter of law. *Id.* at 8-9, 11.

Responding in opposition, Princess Martha argues that material facts in dispute could support the defense of equitable estoppel. Doc. 94 at 4-7.[14]  Specifically, the

---

[14] The Court declines Princess Martha's invitation to deny the EEOC's motion on the ground that it did not set forth its statement of facts in separate, numbered paragraphs or include pinpoint citations. *See* Doc. 94 at 1-3.

EEOC failed to disclose to Princess Martha that Branyan damaged and disposed of her cell phone in December 2021, despite Princess Martha's discovery request for all relevant recordings. *Id.* Princess Martha contends that the cell phone is critical because it contained a voicemail that Princess Martha left for Branyan on August 25, 2021, and its loss prejudiced Princess Martha. *Id.* at 4, 6.[15] Princess Martha does not argue that any evidence supports the defense of unclean hands.

In reply, the EEOC argues that Princess Martha misrepresents the evidence and fails to establish that any alleged discovery violation would be a basis for asserting equitable estoppel against a government agency. Doc. 101.

The defense of equitable estoppel has the following elements in the Eleventh Circuit:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cnty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013), quoting *Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1326 (11th Cir. 2008). With respect to the element of detrimental reliance, the party claiming estoppel "must have relied on its adversary's conduct in such a manner as to change [its] position for the worse, and that reliance

---

[15] The loss of the alleged voicemail was the subject of Defendants' motion for spoliation sanctions against the EEOC. *See* Doc. 39. On June 7, 2024, after an evidentiary hearing, the magistrate court issued an order denying the motion because Defendants failed to meet their burden of proof that a voicemail message existed. Doc. 112 at 5-7.

must have been reasonable in that the party claiming the estoppel did not know nor should have known that its adversary's conduct was misleading." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984) (quotation omitted).

The Supreme Court and the Eleventh Circuit have expressed doubt that the doctrine of equitable estoppel applies to estoppel claims against the federal government. *See*, *e.g.*, *Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314, 1319 (11th Cir. 2003) (collecting cases). To the extent the doctrine is available against the government, "it is warranted only if affirmative and egregious misconduct by government agents exist." *Id.* at 1319-20 (citations omitted).

Viewing the evidence regarding the disposal of Branyan's cell phone in the light most favorable to Princess Martha, no reasonable juror could conclude that the EEOC engaged in affirmative and egregious misconduct that establishes the defense of equitable estoppel. Princess Martha asserts that it relied on the EEOC's misrepresentations in December 2022 and March 2023 that it would produce all relevant recordings and that it had taken appropriate steps to ensure that individuals under its control maintained any potentially discoverable material. Doc. 94 at 4. But Princess Martha fails to explain *how* it relied on these alleged misrepresentations, and in what manner its reliance changed its position for the worse. *See Heckler*, 467 U.S. at 59. If Branyan damaged and disposed of the phone in or around December 2021, it is unclear what negative impact the EEOC's representations a year or more later could

have had.[16] *See Dawkins*, 733 F.3d at 1089 ("While detrimental reliance can still exist when a misrepresentation causes [a party] to refrain from taking mitigating action, the [party] must still assert a causal link and show damages from the misrepresentation.") (citations omitted).  Even assuming, without deciding, that Princess Martha could establish the other elements of equitable estoppel and that a reasonable jury could find that the EEOC's actions were egregious, there is no genuine dispute of fact as to Princess Martha's detrimental reliance.  Accordingly, the EEOC is entitled to summary judgment on this affirmative defense and it will be stricken.

### 2. Affirmative Defense No. Nine

Princess Martha's ninth affirmative defense states:

> To the extent that any of the Charging Party's claims relate to persons or matters which were not made the subject of a timely charge of discrimination filed with the EEOC/FCHR or were not investigated or conciliated by the EEOC/FCHR, Charging Party's claims are barred under the ADA.

Doc. 29 at 16.  The EEOC argues that it is entitled to summary judgment in its favor on this defense because the uncontroverted facts show that the EEOC met conditions precedent with respect to its claims against Princess Martha before filing the instant lawsuit. Doc. 65 at 11-12.

In response, Princess Martha argues that the EEOC is pursuing claims for derivative liability against the TJM entities that are not covered within Branyan's

---

[16] In their motion for spoliation sanctions, Defendants explained that T-Mobile, the only alternative source of the voicemail message, retains voicemail messages for only 30 days. Doc. 39 at 7.  Accordingly, Princess Martha cannot argue that it could have obtained the message itself but for its detrimental reliance on the EEOC's 2022 and 2023 misrepresentations.

charge of discrimination, triggering the ninth affirmative defense. Doc. 94 at 7-12.  The EEOC replies to clarify that it seeks summary judgment on the affirmative defense only with respect to Princess Martha, not the TJM entities. Doc. 101 at 9-10. However, Princess Martha's response in opposition states that "the allegations in the Amended Complaint attempting to attach liability to *Defendant*"—Princess Martha—"based upon actions of Defendants TJM Properties, Inc. and TJM Property Management, Inc. are outside the scope of" the charge of discrimination. Doc. 94 at 10 (emphasis added).  Thus, it appears that Princess Martha is asserting that conditions precedent were not met with respect to the claims against Princess Martha, not just the TJM entities, because of the allegations of joint liability flowing from the relationship between the three entities.

Yet, despite Princess Martha's general contention, it has failed to identify any specific allegation that Princess Martha is liable for conduct by TJM Properties or TJM Property Management; nor does the record evidence support such a theory.  Rather, the EEOC claims that the TJM entities are liable for Princess Martha employees' conduct under joint employer and integrated enterprise theories.  Princess Martha therefore fails to identify specific facts that could support this affirmative defense. *See Booth v. Pasco Cnty., Fla.*, 829 F.Supp.2d 1180, 1195-96 (M.D. Fla. 2011) (denying partial summary judgment to plaintiff on similar affirmative defenses where defendant alerted court to specific facts in possible support of them; granting it with respect to another affirmative defense where defendant presented no evidence that might support it).  In addition, the Court has already concluded that the EEOC satisfied the

conditions precedent with respect to its claims against the Princess Martha. *See* Doc. 27 at 8.   Accordingly, the EEOC's motion for partial summary judgment on the Princess Martha's ninth affirmative defense, with respect to Princess Martha only, is due to be granted. The Princess Martha's ninth affirmative defense will be stricken.

### D. Motions by TJM Defendants (Docs. 59, 61)

The EEOC contends that TJM Properties and TJM Management are liable for the alleged ADA violations because they are joint employers and/or an integrated enterprise with Princess Martha. *See* Doc. 24.   TJM Properties and TJM Management each move for summary judgment based on challenges to these theories and the issue of administrative exhaustion. Docs. 59, 61.   TJM Management argues that the EEOC failed to exhaust administrative remedies, because the EEOC charge and investigation did not include allegations regarding the joint employer or integrated enterprise theories, and the EEOC did not name TJM Management as a respondent, satisfy the conciliation requirements, or amend the charge of discrimination. Doc. 59 at 6-13. Both TJM Management and TJM Properties also make identical arguments that the EEOC exceeded its administrative authority by bringing suit against them when they were not named in the charge of discrimination. *Id.* at 4-6; Doc. 61 at 11-13.   Finally, TJM Properties asserts that there is no reasonable view of the evidence that supports

a joint employer relationship between TJM Properties and Princess Martha. *Id.* at 13-16.[17]  The EEOC filed a single response in opposition to both motions. Doc. 96.

### 1. Relevant Facts[18]

#### a. *TJM Entities' Roles and Responsibilities*

Princess Martha's majority owner, at 84 percent, is the Terence J. McCarthy Family Trust ("the Trust"). Doc. 95 ¶ 7.  Terence McCarthy is the Trust's grantor and sole trustee. *Id.* ¶ 12.  As sole trustee, he serves as the managing member of Princess Martha and has "exclusive authority to manage [its] operations and affairs[.]" *Id.* ¶ 21; Doc. 92-15 at 10.  The Trust also owns, *inter alia*, 100 percent of two Florida corporations: TJM Property Management, Inc., and TJM Properties, Inc. (collectively, "the TJM entities"). Doc. 95 ¶¶ 13, 16.  Terence McCarthy is the director, president, and secretary of both TJM entities. *Id.* ¶¶ 15, 17.  He is the registered agent of all three companies. *Id.* ¶ 19.

Both TJM entities do business under the name "TJM Properties" and "TJM Properties Inc." *See* Doc. 92-54 at 147-149; Doc. 62-6 at 72-73; Doc. 62-5 at 56-57. They share a logo, an email domain, and a website, www.tjmproperties.us, which does not differentiate between them or indicate that two distinct companies exist. *Id.*; Doc. 92-6.  Under the heading "Who We Are," the website states: "TJM Properties Inc. is

---

[17] TJM Properties also argued in its motion for summary judgment that the evidence does not support a finding under the integrated enterprise theory. Doc. 61 at 16-22.  However, its reply concedes that there is a genuine dispute of fact as to this issue. Doc. 98 at 4 n.1.

[18] *See* n.1, *supra*.

a real estate acquisition and management firm specializing in hotels and senior living," and it lists employees of both companies. *Id.* at 2.   Employees of both companies identify "TJM Properties" or "TJM Properties Inc." as their employer in their email signatures and LinkedIn profiles, irrespective of which company issues their paycheck. Docs. 92-8, 92-10, 92-12, 92-14, 92-31; Doc. 92-54 at 156.   The TJM entities share an office suite in Clearwater, Florida, which some Princess Martha employees referred to as "the corporate office." Doc. 95 ¶ 18; *see* Doc. 62-5 at 48; Doc. 62-2 at 40.

TJM Management is the managing company for Princess Martha and other senior living facilities owned by the Trust. Doc. 92-3; Doc. 92-54 at 13; Doc. 80-1 at 261-62.   TJM Management's regional controller had access to the bank accounts of all Trust-owned facilities, and its regional director of operations oversaw the facilities' executive directors. Doc. 62-2 at 47-48; Doc. 92-54 at 52-60; Doc. 62-5 at 61, 96-97, 129-30; Doc. 80-1 at 59, 61-62, 96-97.

Princess Martha's employees understood TJM Management to be Princess Martha's "parent company," a term used in the employee handbook. Doc. 80-1 at 104; Doc. 62-2 at 114.   Princess Martha's executive director spoke to TJM Management's regional director of operations daily with updates about the day-to-day operations of Princess Martha. Doc. 80-1 at 264-65.   She also met with Terence McCarthy every month, although she testified that she did not need his authorization to make decisions. Doc. 80-1 at 274-76.   TJM Management handled the hiring process when Von Blomberg came on as Princess Martha's HR director and business manager; she

interviewed only with TJM Management employees, and the job posting referred only to TJM rather than Princess Martha. Doc. 62-2 at 40-50.

TJM Management also supervised Von Blomberg in performing some regional HR duties for Trust-owned companies. *See generally* Doc. 62-2; Doc. 92-18.   Von Blomberg's regional duties included updating the employee handbooks, performing some functions related to payroll and benefits, training and running monthly meetings with other facilities' HR directors, and ensuring other facilities' compliance with the ADA. *Id.* at 64-67, 113-162.   The employee handbook she updated was used by Princess Martha, TJM Management, TJM Properties, and other senior living facilities. *Id.* at 64-65; Doc. 92-20.

TJM Properties, Inc.'s work involves property acquisition and real property management of Trust-owned facilities across the nation. *See* Doc. 62-6 at 41-44; Doc. 62-5 at 115-16.   The record evidence primarily discusses TJM Properties employees Matt Bradley and Dale Schooley. Doc. 62-6 at 41-44, 65-66.   Both of them handled Trust-owned properties' property and casualty insurance as well as some tax paperwork. *Id.*; Doc. 62-5 at 84-85; Docs. 92-32, 92-33, 92-34.   Bradley and Schooley worked with TJM Management in connection with a bank loan for Princess Martha. Docs. 92-26, 92-27.   They also worked with Princess Martha employees directly: Schooley assisted Von Blomberg when she had questions about the rental agreements of the commercial businesses to which Princess Martha rented its ground floor, because Schooley had established those agreements, while Bradley and Von Blomberg communicated about the management of Princess Martha's parking garage. Doc. 62-

2 at 74, 86-87.  Once, after a taxi collided with the parking garage door, Terence McCarthy signed a letter establishing Bradley as an "Authorized Employee" of Princess Martha in the resulting small claims court case so that Bradley could serve as Princess Martha's company representative. Doc. 92-36.  However, Princess Martha's executive director testified that—unlike with TJM Management employees—she did not report to Bradley or Schooley and they did not have authority over her. Doc. 80-1 at 270-71, 272-73.

### b. EEOC Investigation and Procedural History

Branyan's charge of discrimination and amended charge of discrimination, filed on November 21 and 23, 2021, named only Princess Martha as a respondent. Docs. 65-1, 65-2.  The EEOC sent a notice of the charge of discrimination and an amended notice of the charge of discrimination to Princess Martha on November 23 and 30, 2021. Docs. 65-3, 65-4.  Princess Martha immediately alerted TJM Management about the charge, as required by the Management Agreement between them. Doc. 92-54 at 134-36.  On April 5, 2022, Von Blomberg sent Don Dunkle, then-regional director of operations for TJM Management, "all documents submitted to EECO in dispute with Sarah Branyan's claim." Doc. 92-44.  Dunkle forwarded Von Blomberg's email to another TJM Management executive, stating that he did not "see any need for outside counsel at this point" because Von Blomberg "has it under control." *Id.*

The EEOC sent notice of the charge of discrimination to TJM Properties on May 25, 2022. *See* Doc. 59 at 2.  On May 31, 2022, Matt Bradley forwarded the charge of discrimination to TJM Management's regional controller, to whom Von Blomberg

provided more information in response to his request. Doc. 92-45.  Bradley sent a response to the EEOC on behalf of TJM Properties on June 1, 2022. Doc. 92-46.  On June 29, 2022, the EEOC contacted Bradley to schedule a pre-determination interview and notified him that it believed TJM Properties and Princess Martha were joint employers. Doc. 92-49.

On June 27, 2022, Von Blomberg sent a draft rebuttal letter to Princess Martha's executive director and TJM Management's regional director of operations and regional controller for their review. Doc. 92-47.  The regional controller forwarded it to Bradley, who notified Von Blomberg and all the initial recipients that "Terry [Terence McCarthy] wants to engage an attorney on this. … Please hold off on the response letter until the attorney can review." *Id.*  Von Blomberg complied, and testified in her deposition that she understood Bradley's statement to be an instruction she needed to obey. Doc. 62-2 at 267.  However, if he had given her a different instruction about the EEOC investigation, such as directing her to negotiate a settlement, she explained that she would have asked the executive director if she should obey him. *Id.* at 267-68.

The EEOC issued a letter of determination to Branyan and the respondents, Princess Martha and "TJM Properties, Inc.," on July 6, 2022. Doc. 65-5.  The letter notified them of the EEOC's determination that reasonable cause existed to believe that the respondents discriminated against Branyan due to her disability, and it invited the respondents to participate in conciliation. *Id.*  Von Blomberg immediately

forwarded the letter to Princess Martha's executive director and TJM Management's regional director of operations and regional controller. Doc. 92-52.

Princess Martha and TJM Properties participated in conciliation, *see* Doc. 10 ¶ 15, unsuccessfully, and the EEOC filed the instant lawsuit. Doc. 1.  TJM Properties and TJM Management subsequently filed a joint motion to dismiss in which they argued, *inter alia*, that the EEOC had not exhausted its administrative remedies because the charge of discrimination did not name them as respondents or contain allegations regarding a joint employer relationship or integrated enterprise, the EEOC did not investigate those theories, TJM Properties did not receive notice until long after the charge was filed, and TJM Property Management was never notified. Doc. 30 at 5-13.  The Court issued an Order on December 11, 2023, denying the motion to dismiss. Doc. 69.

### 2.  Exhaustion of Administrative Remedies

First, both TJM entities argue in their motions for summary judgment that the EEOC failed to exhaust its administrative remedies with respect to the claims against them, because only Princess Martha was named in the charge of discrimination.  Both entities contend that the EEOC has exceeded its executive authority under 29 C.F.R. 1601.27, and TJM Property Management also makes a specific exhaustion argument that mirrors the arguments in TJM's motion to dismiss.

#### *a.  29 C.F.R. 1601.27*

29 C.F.R. 1601.27 authorizes the EEOC to "bring a civil action against any respondent named in a charge" of discrimination.  TJM emphasizes the word

"named," arguing that the EEOC exceeds its regulatory authority when it sues a party that was not named in the charge. Doc. 59 at 4-6; Doc. 16 at 11-13. Although they acknowledge that there is a liberal naming requirement for a "person" seeking to file a lawsuit, they posit that a different standard applies to suits filed by the EEOC, pursuant to the plain language of 29 C.F.R. 1601.27. Doc. 98 at 1-2. Aside from the regulatory language, however, TJM does not cite any authority for its contention that a different standard applies for suits filed by the EEOC. The Court is not persuaded that it does.

The Court explained the exhaustion requirements in its December 11, 2023 Order:

> Before bringing suit under the ADA, plaintiffs are required to exhaust their administrative remedies by filing a charge of discrimination with the EEOC. *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018). The purpose of the exhaustion requirement is to allow the EEOC to "have the first opportunity to investigate the alleged discriminatory practices[.]" *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citations and quotations omitted). Administrative exhaustion is a jurisdictional prerequisite to a discrimination claim. *Peppers v. Cobb Cnty., Ga.*, 835 F.3d 1289, 1296-97 (11th Cir. 2016) (quotation omitted). Nonetheless, the Eleventh Circuit is "extremely reluctant to allow procedural technicalities to bar claims brought under discrimination statutes." *Batson v. Salvation Army*, 897 F.3d 1320, 1327, quoting *Gregory*, 355 F.3d at 1280 (modification omitted). As such, "the scope of an EEOC complaint should not be strictly interpreted." *Id.*
>
> In general, only a party named in an EEOC charge can be sued in a subsequent lawsuit. *Id.* at 1296, citing *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994). However, courts "liberally construe" the naming requirement. *Peppers*, 835 F.3d at 1296. To determine whether a party not named in the

EEOC charge may be sued, courts consider several non-exclusive factors:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

Doc. 69 at 8-9, quoting *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994).

The *Virgo* holding follows from the long-standing rule that the scope of an EEOC charge should not be strictly interpreted. *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970).[19] The former Fifth Circuit relied on the same principle to hold—in a case brought by the EEOC—that a charge of discrimination is sufficient to trigger an investigation into "all practices which can reasonably be expected to grow out of the charge of discrimination." *Equal Emp. Opportunity Comm'n v. Brookhaven Bank & Tr. Co.*, 614 F.2d 1022, 1024-25 (5th Cir. 1980), quoting *Sanchez*, 431 F.2d at 466; *see also Brookhaven*, 614 F.2d at 1025 ("If the employer has notice of the charge and has been offered an opportunity to remedy the problem without litigation, it should not be allowed to avoid enforcement of the law because the original charge filed with the EEOC [by] the aggrieved party is slightly different from the

---

[19] In *Bonner v. Pritchard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

complaint filed in court by the EEOC.").  Just as the flexibility that is given to the scope of an EEOC charge applies to suits brought by either individuals or the EEOC, so too should *Virgo*'s holding that courts may "liberally construe" the naming requirement as long as "the purposes of [the discrimination statute] are fulfilled." 30 F.3d at 1358-59.

Indeed, courts have applied *Virgo*'s holding to cases brought by the EEOC. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. Universal Diversified Enterprises Inc.*, No. 1:18-cv-23573, 2019 WL 13255689, *8 (S.D. Fla. Feb. 27, 2019); *Equal Emp. Opportunity Comm'n v. Lab. Sols. of AL LLC*, No. 4:16-cv-1848, 2017 WL 4956420, *3 (N.D. Ala. Nov. 1, 2017).

Moreover, the statutory language on which 29 C.F.R. 1601.27 is based does not support TJM's argument.  29 C.F.R. 1601.27 is the implementing regulation for 42 U.S.C. § 2000e-5, the enforcement provision of discrimination laws. *See* 42 U.S.C. § 12117(a) (enforcement actions under the ADA are governed by the procedures set forth in § 2000e-5).  Under § 2000e-5(f)(1), just like 29 C.F.R. 1601.27, "the Commission may bring a civil action against any respondent…named in the charge" of discrimination.  However, the same subsection uses identical phrasing to describe the naming requirement that applies to suits brought by individuals: "[A] civil action may be brought against the respondent named in the charge…by the person claiming to be aggrieved[.]"  The *Virgo* court was therefore construing the same phrasing, within the same statutory subsection, that TJM rely on now.

Accordingly, the Court will not strictly construe the naming requirement in 29 C.F.R. 1601.27. It will instead apply the *Virgo* factors, just as it would be required to do in a suit brought by an individual.

### b. The Virgo Factors

The Court's December 11, 2023 Order contained a detailed analysis of the *Virgo* factors in response to the TJM entities' argument in their motion to dismiss that the EEOC had not exhausted its administrative remedies. Doc. 69 at 10-17. The TJM entities rely on identical arguments in their motions for summary judgment, arguing that the *Virgo* factors weigh in their favor, that the EEOC did not provide adequate notice that it was proceeding against the TJM entities on theories of joint employer or integrated enterprise liability, and that it was required to amend the charge of discrimination to include those theories. Doc. 59 at 6-13; Doc. 61 at 11 n.2; *see* Doc. 30 at 7-13. The TJM entities neither reference the prior Order nor identify a basis for reconsidering its findings. Absent grounds to do so, the Court declines to reconsider its rejection of the TJM entities' legal arguments in the December 11, 2023 Order.

Of course, some of the conclusions in the prior Order must be revisited to the extent that they relied upon allegations in the Complaint, which the Court accepted as true when ruling on the joint motion to dismiss. *See* Doc. 69 at 2 n.1. Now, on summary judgment, the Court no longer accepts those allegations as true. Instead, it must view the record evidence in the light most favorable to the EEOC and draw all reasonable inferences in its favor. *See*, *e.g.*, *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). Accordingly, it will review the December 11, 2023 Order

46

to determine whether there is record evidence to support the allegations in the Complaint upon which its legal conclusions rested.

First, the evidence continues to support a finding that there is a similarity of interests between the Princess Martha and the TJM entities for the purpose of the first *Virgo* factor. The Court previously relied on allegations that all three entities "share common ownership and management" and have interrelated operations. Doc. 69 at 10-11. The EEOC has offered undisputed evidence indicating that Terence McCarthy is the registered agent and sole trustee of the trust that is either the owner or the majority owner of all three defendants. Doc. 95 ¶¶ 13-14, 19-20. McCarthy is the president of both TJM entities and the managing member of Princess Martha, which gives him the authority to make all management decisions. *Id.* ¶¶ 15, 17, 21; Doc. 92-15 at 2, 10; Doc. 80-1 at 276. Further, all three defendants share legal counsel. This evidence is sufficient to establish the first *Virgo* factor in the EEOC's favor.

The second factor, whether Branyan could have ascertained the TJM entities' identity at the time she filed the EEOC charge, still does not weigh in favor of either party. The TJM entities continue to rely on an email that TJM Management sent to Branyan in connection with her application. Doc. 59 at 10; Doc. 92-53.[20] The email was from "TJM Property Management Inc.," had a subject line of the same name, and referred to "The Princess Martha – Activity Coordinator position at *our company*." *Id.* (emphasis added). Although the EEOC points out that TJM Management had no

---

[20] TJM Properties does not cite any evidence indicating that Branyan could have ascertained its identity at the time she filed her charge of discrimination.

public presence by that name, *see* Doc. 96 at 3-4, it is possible that the email from TJM Management could have put Branyan on notice of its existence.  However, Branyan's explanation that she believed TJM was a typo for "TPM" (the Princess Martha), and did not realize it was a separate company, Doc. 62-1 at 118-20, is not unreasonable. Overall, this factor still weighs in neither party's favor.

Next, the evidence supports a finding that the TJM entities received adequate notice of the EEOC investigation and had the opportunity to conciliate.  TJM Properties previously conceded it received actual notice of the investigation from the EEOC's May 2022 letter, and that it participated in conciliation. *See* Doc. 69 at 22; Doc. 83 ¶ 23.  Moreover, the record evidence bears out the EEOC's allegation that the TJM entities are closely related enough that the notice to TJM Properties gave constructive notice to TJM Management as well, and that TJM Properties' opportunity to conciliate may be imputed to TJM Management. *See id.* at 22, 24-25. The TJM entities share an office suite, phone number, and receptionist, and Terence McCarthy is the registered agent, president, director, and secretary for both. Doc. 95 ¶¶ 15, 17-19; Doc. 92-54 at 149-50.  Employees of both identify themselves as working for "TJM Properties," and the companies use the same logo, website, and email domain. *Id.* at 148-52, 157-58; Doc. 92-7.  TJM Management also received actual notice about the EEOC charge from Princess Martha, which notified it "immediately" after receiving the charge, and certainly by April 2022. Doc. 92-44; Doc. 92-54 at 31, 71-75, 134-36; Doc. 92-8.  The evidence therefore supports a finding that the TJM

entities received notice of the EEOC investigation and had an opportunity to conciliate.

The final *Virgo* factor is whether the unnamed parties were prejudiced by not being named in the EEOC charge.  For this factor, TJM Management offers the same argument that the Court previously rejected: that "it is only reasonable to assume" it was prejudiced. Doc. 59 at 10; *see* Doc. 69 at 16-17.  Neither TJM entity identifies any evidence that supports a finding of prejudice.  And, as the Court noted in its December 11, 2023 Order, "courts have generally found that an unnamed party that had notice and an opportunity to conciliate" does not suffer prejudice. *Id.* at 16 (collecting cases). The *Virgo* factors therefore weigh in the EEOC's favor, and against the TJM entities' argument that the failure to name them in the charge of discrimination entitles them to summary judgment.

Accordingly, for the reasons stated in this Order and the December 11, 2023 Order, which this Order incorporates by reference, the TJM entities are not entitled to summary judgment based on an alleged failure to exhaust administrative remedies. TJM Management's motion for summary judgment is due to be denied.

### 3.  Joint Employer Relationship

TJM Properties also moves for summary judgment in its favor based on its argument that the evidence does not support a finding that TJM Properties and Princess Martha are joint employers. Doc. 61 at 13-16.

In its response in opposition to TJM Properties' motion for summary judgment, the EEOC contends that all three defendants have a joint employer relationship; it

does not make specific arguments about the alleged joint employer liability of TJM *Properties* and Princess Martha compared to that of TJM *Management* and Princess Martha. *See* Doc. 96 at 29-30; *see also id.* at 23-29 (making combined argument as to integrated enterprise).  However, as will be discussed below, the joint employer theory addresses the relationships of companies that are concededly separate entities.  Thus, the Court must determine whether there is sufficient evidence from which a reasonable jury could conclude that TJM Properties only, not the TJM entities considered together, may be held liable as a joint employer with Princess Martha.

In *Virgo*, the Eleventh Circuit adopted the standard for joint employment stated in *Nat'l Labor Relations Board ("NLRB") v. Browning-Ferris Industries*, 691 F.2d 1117 (3d Cir. 1982):

> The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus the joint employer concept recognizes that the business entities involved *are in fact separate* but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Virgo*, 30 F.3d at 1360, quoting *NLRB*, 691 F.2d at 1122 (emphasis added).  The *Virgo* court applied the *NLRB* standard in the context of a jurisdictional inquiry: to determine whether two defendants could be combined to satisfy the definition of "employer" in Title VII as an individual or firm with fifteen or more employees. *See Virgo*, 30 F.3d at 1359-61; 42 U.S.C. § 2000e(b).  Because the record contained an adequate basis for the district court's finding that they were joint employers, the court concluded that both

defendants "could be subject to Title VII liability," for jurisdictional purposes. *Id.* The court went on to apply traditional agency principles to determine whether the defendants were in fact liable. *Id.* at 1362.

The Eleventh Circuit later specified that joint employers are not strictly liable for misconduct relating to employment in which they were uninvolved.  In *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998), it found that an entity that "had absolutely nothing to do with" the adverse employment decision could not be liable for it even if the entity were considered a joint employer.  Rather, in discrimination cases the joint employment theory is meant to "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Id.*[21]

The "basic question" that determines whether an entity is a joint employer who may be sued in a discrimination suit is "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999).  "An examination of this question requires consideration of the totality of the employment relationship" at issue in the claim. *Peppers v. Cobb Cnty., Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016) (citation

---

[21] Other circuit courts have cited *Llampallas* or *Virgo* in reaching the conclusion that being a joint employer does not itself confer vicarious liability, and that a joint employer must bear some responsibility for the discriminatory act to be liable. *See, e.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228-29 (5th Cir. 2015) (ADA context); *Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 811-12 (7th Cir. 2014) (ADA context); *Torres-Negron v. Merck & Co., Inc.*, 488 F.3d 34, 41 n.6 (1st Cir. 2007) (several types of discrimination including ADA); *see also U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc.*, 915 F.3d 631, 641 (9th Cir. 2019), citing *Burton* and *Whitaker*.

omitted).  In particular, courts consider how much control the alleged joint employer exerted on the employee and whether the alleged joint employer had the power to hire, fire, or modify the terms and conditions of his or her employment. *Id.* (citations omitted); *see also Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1300 (11th Cir. 2021) ("Nor can Bradley Arant be liable under Title VII on a joint employer theory…because there are no facts to suggest that Bradley Arant exercised any control over [the party alleging discrimination]'s employment with the Bank."), citing *Llampallas*.

Here, the EEOC asserts that a joint employment relationship exists between all three Defendants because Von Blomberg, who made the decision not to hire Branyan, had regional HR duties and drafted the employee handbooks used by all TJM companies in the region, including the anti-harassment and drug testing policies.[22] Doc. 96 at 29-30.  These facts are inadequate to establish that TJM *Properties*, rather than TJM Management, exerted control over Princess Martha's hiring practices or Von Blomberg's actions with respect to Branyan.  Taken to its logical conclusion, the EEOC's argument would create strict liability for all Trust-owned companies, including the other senior living facilities, without any evidence of the subsidiaries' involvement in the relevant employment or hiring decision, merely because they used the same handbook.  The law does not support this position.

---

[22] Contrary to the EEOC's characterization, the evidence does not demonstrate that Von Blomberg drafted the handbooks or the relevant policies herself. *See* Doc. 62-2 at 250; Doc. 62-5 at 76-77. Even if she had, however, the same conclusion would be compelled.

Viewed in the light most favorable to the EEOC, the record evidence supports a finding that TJM *Management* employees exerted control over Princess Martha and Von Blomberg.  But none of those individuals were employed by TJM *Properties*, and there is no evidence that any TJM Properties' employee did the same.  Contrary to the EEOC's arguments, neither Von Blomberg's regional HR duties nor her work with Matt Bradley on the Princess Martha parking garage could lead to a reasonable finding of control by TJM Properties over Princess Martha's hiring practices or its failure to hire Branyan.[23]  Nor is there any record evidence that supports such a finding.  TJM Properties is therefore entitled to summary judgment as to the theory that it is a joint employer with the Princess Martha.

Accordingly, it is **ORDERED**:

1. Defendant The Princess Martha, LLC's Motion for Summary Judgment (Doc. 58) is **GRANTED-IN-PART and DENIED-IN-PART**.  As no genuine issues of material fact exist as to Princess Martha's lack of actual

---

[23] The cases on which the EEOC relies are unavailing, because they are more relevant to the evidence as it relates to TJM Management, not TJM Properties. Doc. 96 at 29-30.  *E.E.O.C. v. Papin Enterprises, Inc.*, No. 6:07-cv-1548, 2009 WL 961108 (M.D. Fla. Apr. 7, 2009), involved a franchisor and franchisee relationship in which the franchisor exerted some control over the policy at issue in the discrimination suit.  The EEOC misstates the holding of *E.E.O.C. v. Rooms to Go, Inc.*, No. 8:04-cv-2155, 2006 WL 580990, *9 (M.D. Fla. Mar. 8, 2006), where the court expressly did not decide the issue of a parent company's alleged control over the administration of its subsidiary's anti-harassment policy—facts which are, in any event, inapposite given the dearth of evidence that TJM Properties exercised control over Princess Martha's policies.  Evidence of the other company's promulgation of policies and coordination of benefits with the primary employer in *Burnett v. Ocean Properties, Ltd.*, 422 F. Supp. 3d 400 (D. Me. 2019), and *Laurin v. Pokoik*, No. 02-cv-1938, 2004 WL 513999 (S.D.N.Y. Mar. 15, 2004), render those cases inapposite as well.

knowledge of the Charging Party's disability, all Defendants are entitled to judgment in their favor as a matter of law as to Count I only.  The motion is otherwise denied.

2. Defendant TJM Property Management, Inc.'s Motion for Summary Judgment (Doc. 59) is **DENIED**.

3. TJM Properties, Inc.'s Motion for Summary Judgment (Doc. 61) is **GRANTED-IN-PART and DENIED-IN-PART**.  The motion is granted as to the theory that TJM Properties, Inc., has a joint employer relationship with Princess Martha.  The evidence before the Court does not establish that TJM Properties, Inc., is a joint employer with Princess Martha.  The motion is otherwise denied.

4. Plaintiff EEOC's Motion for Partial Summary Judgment (Doc. 65) is **GRANTED**.  The EEOC is entitled to judgment in its favor with respect to the Princess Martha's Sixth and Ninth Affirmative Defenses. *See* Doc. 29 at 15-16.  These affirmative defenses are hereby stricken.

5. Princess Martha's motion to strike (Doc. 100) is **DENIED**.

6. To avoid piecemeal judgments, a final judgment in favor of Defendants as to Count I will be entered at the conclusion of this litigation.

7. Within fourteen (14) days, the parties shall file a joint notice on CM/ECF which identifies their availability for trial in 2025.

**DONE** and **ORDERED** in Tampa, Florida on September 26, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties